TEXAS COMPANY *v.* HARKER ᴇᴛ ᴜx.

[No. 91, October Term, 1956.]

*Decided February 11, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Ward B. Coe, Jr.,* with whom were *Anderson, Barnes & Coe* on the brief, for the appellant.

*W. Lee Harrison* and *Richard C. Murray* for the appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree ordering the Texas Company, appellant, to specifically perform a lease of certain real property entered into with Hubert H. Harker and Elizabeth Ruff Harker, his wife, appellees, as lessors.

The subject property is located in an established residential development known as Fieldstone, Randallstown, Baltimore County. The development is bounded on the south by Liberty Road, on the west by McDonogh Road, on the north by Old Liberty Road, now called Church Road, and on the east by a more or less undeveloped area. This development was started in 1923 by the recording of the original plat of Fieldstone, at the time of the recording of a deed from Seymour Ruff and wife to Katherine K. Blair, et al., of Lot 19 in that development. This deed contains complete and detailed restrictive covenants applying to all lots in the development and on the plat as filed. Among the restrictions applying was the following: "That no lot or part thereof, or any of the land on said plat, or any building now or hereafter erected or placed thereon, shall be used or occupied by any asylum, sanitarium or hospital, or for any manufacturing or business purpose or purposes whatsoever, or for any dangerous or offensive pur-

pose whatsoever, except that Lots Nos. 14, and 111 on said plat may, at the option of said Grantors herein, their and each of their heirs and assigns, be used, leased or sold for such store or business purposes, not of a recognized dangerous or offensive character." As will be seen from these restrictions, Lots 14 and 111 could be used for limited commercial purposes. On January 22, 1945, the appellees acquired Lot 111 and on May 12, 1950, they acquired Lot 110 subject to the aforesaid restrictions. Lot 111 is at the extreme southwest corner of the subdivision and binds 68 feet 9 inches on Liberty Road and 174 feet 3 inches on McDonogh Road, and is unimproved. Lot 110 adjoins it on the east and has a frontage of 70 feet on Liberty Road and a depth of about 200 feet, containing a frame house which has been converted into three apartments. Prior to 1954 all of the Fieldstone development was zoned residential. On application by the appellees, Lots 110 and 111 were rezoned commercial on April 9, 1954. The appellees have been granted a special permit to erect a gasoline service station on these two lots. Mr. Harker testified that he formerly applied for a special permit for a gasoline service station on Lot 111 alone and it was denied because the lot was too small.

On May 2, 1955, the appellees signed a lease agreement with the appellant for parts of Lots 110 and 111 for the term of fifteen years. By the lease the appellant agreed to furnish to the appellees "a line and grade survey of the demised premises prepared by a registered surveyor and plans and specifications for the construction of a modern service station on said premises." The appellees agreed to erect said modern service station for the use of the appellant. The lease also contained the following provision: "Provided, however, that, anything to the contrary herein notwithstanding, if the title to said premises shall be found not good and merchantable, or if for any reason it shall be found to be unlawful or in violation of any enforceable restrictive covenant, law, ordinance or regulation to construct a service station on the demised premises or any part thereof in accordance with such plans and specifications or to operate the same, then Lessee shall have no obligation to furnish said survey, plans or speci-

fications and this Lease shall be void and of no effect." Because of the restrictions the appellant refused to furnish the appellees with the survey, plans and specifications of the filling station. Appellees, therefore, brought a suit against the appellant for specific performance of the lease. After answer filed, testimony was taken before the chancellor who decreed that the restrictive covenants should not affect Lots 110 and 111 and ordered the specific performance of the lease. From that decree the appellant appeals.

The appellees do not deny the enforceability of the restrictions but claim that changed conditions in the development and the express reservation of Lot 111 for commercial use permits the expansion of such use to encompass Lot 110. The appellant in its brief states: "The case at bar is a 'friendly' suit in the sense that the Appellant desires the *locus in quo* under the lease for a service station. But the Appellant does not desire the *locus in quo* under the lease if there is any reasonable chance that a service station might later be enjoined. For this reason, and to be fair with the Court, Appellant has tried scrupulously in the Court below and here to present fully and fairly all facts in favor of the enforceability of the restrictions." The brief of the appellant has fully so presented the case. Of course, although restrictions are originally enforceable, equity may refuse enforcement of the restrictions if there has been such a change in the neighborhood that the covenant is unsuited to its present character. Also, equity may under some circumstances refuse enforcement when there has been acquiescence of violation of the restrictions. *Schlicht v. Wengert,* 178 Md. 629, 635, 15 A. 2d 911, and cases there cited.

Mr. Harker, one of the appellees, testified that he originally owned Lot 111 on the corner and he subsequently purchased Lot 110 which were rezoned commercial and he also has a special permit for the service station. He was not able to build a service station on Lot 111 alone because it is not large enough "for a decent exit". He has lived in the Randallstown area for all of his sixty-nine years. In 1923, when the restrictions were placed, there was an old farm house back of the two subject lots and then another house within the platted

area east of Randall Road. The area surrounding Fieldstone to the west across McDonogh Road was an open field. Southeast of Fieldstone there was a building that had always been commercial. The general area surrounding the intersection of McDonogh and Liberty Roads was practically undeveloped.

Mrs. Harker testified that she was the daughter of Seymour Ruff, who was the developer of Fieldstone, and she had lived in the Randallstown area all her life. In 1923 within the development itself was a barn and two or three houses. The area northwest of the tract was open country except for one house. There was but one store which was probably a quarter of a mile beyond this particular property. In 1923 there was and there still is a barbershop on the southeast corner of Liberty Road and Green Lane immediately across from the lots in question. West of Green Lane and on the south side of Liberty Road was an old community hall building and a school.

Mr. Carl Heinmuller, a realtor called by the appellees, testified in part that in 1923, when the restrictions were placed on the property, Lot 111 was adequate for commercial purposes and that most subdivisions in that neighborhood provided for small corner stores. There had been a vast increase in the commercial use of the area immediately to the left of Fieldstone, and great residential increase in the total area, including Fieldstone. Lot 111 is not adequate for commercial purposes at this time. Thirty years before shopping was concentrated in small corner stores. Today shopping is done mostly in shopping centers which are much larger and which have parking areas. He did not think there were any set back requirements in 1923. The present set back requirements would affect the utilization of corner Lot 111 for commercial purposes. The required set back for Lot 111 is 10 feet. He said: "At the present time, Lot No. 111, which is the corner lot, would have a building on it no more than, I think it is 41 feet 9 inches wide. In my opinion, that is too small for a store of today's size. It is true there are many stores no more than 40 feet; some are only 20 feet, but the present style or type is over 40 feet wide. * * * Parking

regulations require 170 square feet parking area for each footage of floor space. Q. Just using Lot No. 111 by itself? A. Yes, it would. That doesn't mean I think it is desirable. I think it is physically possible." On cross-examination, when asked what would be the effect on property values in Fieldstone if Lots 110 and 111 were used for a service station or some other commercial activity, he replied that Lot 109A, immediately adjoining, and Lot 108B, adjoining that, might decline in their residential value, Lot 109A as much as twenty-five percent and Lot 108B as much as ten percent. It was also perfectly possible that it would not affect the value of those lots in any way. He said: "I made the usual appraisal study of the neighborhood, which included the checking of four commercial properties in the area and three residential lots in the area and my valuation conclusions were these: that a current market value of Lot No. 111 by itself as it now stands, is $10,500, or about $150 per front foot. The current market value of Lot No. 110, as it is now for residential use, is only $3,500, or approximately $50 per front foot. The current market value of a parcel consisting of Lots No. 111 and No. 110, if used for commercial purposes, is $26,200, or approximately $200 per front foot." He further said that if Lot 110 were made available there would be a width of 138 feet 9 inches and the highest and best use would be a gasoline station.

Mr. J. Walter Jones, a realtor and an officer of the Real Estate Board of Baltimore City, called by the appellant, testified that Lot 111 could be economically used commercially by itself. He did not believe it could be used for a service station. It could be used for a small store but he did not believe it would be advantageous to put a store there. If a service station were placed on Lot 111 it might affect the adjoining property, Lot 109A, as much as ten percent, but the erection of a service station on both Lots 110 and 111 would have very little effect.

By stipulation a letter was admitted in evidence from Mr. Lester H. Gardner, a professional engineer and in consulting practice as to the handling of petroleum products for both industry and public consumption. He concluded his letter

with a statement that motor fuel dispensing services do "not constitute an objectionable hazard by reason of the handling and dispensing of inflammable motor fuel."

There have been some apparent violations of the restrictions since the development was opened. The single family residence on Lot 110 has since 1950 contained three apartments. The farmhouse on Lot 119 at the corner of McDonogh and Church Roads for about ten years has contained two apartments. The house on Lot 106 at the corner of Liberty and Fieldstone for two years has contained two apartments. On Lot 109A, adjoining subject Lot 110, a Dr. Boatman had his dentist office and built a small wing for that purpose. He moved away about two years ago. A Mr. Blair owns residence Lots 19 and 20 on the corner of Randall and Liberty Roads and operated in a barn or garage there, up to the time testimony was taken in this case, a small lawnmower and light-garden tractor-repair and sales shop.

The appellees admit that the apartments erected on Lots 106, 110 and 119 may not violate the restrictions. *Saratoga Building Corp. v. Stables Co.,* 146 Md. 152, 126 A. 52, 128 A. 270. The dentist office probably constituted a violation of the restriction. *Osborne v. Talbot,* 197 Md. 105, 78 A. 2d 205. However, this was removed about two years ago and there is nothing to show that it impaired the residential character of Fieldstone. Mr. Blair's shop on Lots 19 and 20, although an apparent violation, was in the undeveloped part of Fieldstone. It had no apparent detrimental effect on that part of Fieldstone. Moreover, we are advised that since the taking of testimony the shop has been discontinued and the immediate area is being developed residentially. These violations would not constitute evidence that the restrictions were abandoned or that the character of the neighborhood has changed. *Schlicht v. Wengert, supra,* 637. From this testimony we must conclude that there has been no change in the residential character of the development and that there has been no waiver or acquiescence in the minor violations of the restrictions.

As to the commercial development outside of Fieldstone, the area to the west of the development has been developed

commercially. Of course, in deciding this question we are not confined to a consideration of the particular area restricted. *Esso Standard Oil Co. v. Mullen,* 200 Md. 487, 490, 90 A. 2d 192, and cases there cited. All the land on the original plat east of Randall Road at the time of the hearing was undeveloped except for the old house with outbuildings which antedated the development. However, the Randallstown neighborhood to the west and southwest of the Fieldstone development from the intersection of Liberty and McDonogh Roads westward along Liberty Road has been developed both residentially and commercially. According to the plat offered in evidence and testimony in the case, on the north side of Liberty Road and across McDonogh Road from Lot 111 is a gasoline service station with a parking lot in the rear; a stone building containing a pharmacy and the Randallstown bank, with a bowling alley and recreation hall above; a shopping center; an old dwelling converted into apartments; and several stores. The number of depositors at the bank has doubled since 1945 and the bank has accordingly doubled its space, as has the pharmacy. Beyond Church Road are more stores. Green Lane is more or less a southern extension of McDonogh Road and starts south from Liberty Road. Proceeding on the south side of Liberty Road west from Green Lane are two dwellings; a health center; the Randallstown School; a dwelling containing an insurance office; another dwelling; the Presbyterian Church; and an unimproved lot. East from Green Lane along the south side of Liberty Road at the corner, opposite the subject lots is an old building containing apartments and a barber shop; two old dwellings; open land; a large stone residence on a lot about 250 feet in width; and a new high class residential development also known as Fieldstone. On the north side of Church Road and north of and opposite the original Fieldstone development, according to Mr. Carl Heinmuller, are dwellings of a rather nice character, not as nice as Fieldstone, with two exceptions.

In all the cases where residential restrictions have been held unenforceable, there has been deterioration in the residential character of the neighborhood or a failure from the beginning

of the restricted development, so that the restrictions no longer served their intended purpose. In *Needle v. Clifton Realty Corp.*, 195 Md. 553, 73 A. 2d 895, relied on by the appellees, it was held that it would be inequitable and oppressive to give effect to the restrictive covenants. The development, started in 1922, was divided into 344 lots. During the next thirteen years, until 1935, the developer sold 287½ lots, all subject to the restriction for residential purposes. No lots were sold between 1935 and 1944. The evidence showed that all the lots in the development on Reisterstown Road had been zoned commercial, including the seven lots in question. Also, 82 lots in various parts of the development had been sold for non-payment of taxes and not redeemed by the taxpayers. Reisterstown Road was heavily traveled and highly developed as a commercial area making the remaining lots within the restricted area undesirable for residential purposes. There has been no such change in Fieldstone. In *Norris v. Williams*, 189 Md. 73, 54 A. 2d 331, where the residential restrictions were held non-enforceable, the one acre had been restricted for residential purposes only for a period of fifty years, or until 1967. The evidence showed that this acre was located on the west side of Dundalk Avenue. Along this west side a business section had grown up to service a residential area which had grown up on the east side of Dundalk Avenue. The acre originally restricted was held to be no longer subject to the restriction on account of the great change in the neighborhood. There has been no such great change here. In *Gulf Oil Corp. v. Levy*, 181 Md. 488, 30 A. 2d 740, since the time the residential restriction was imposed the neighborhood surrounding the property had developed from one of first class residential properties to one of complete commercialization. It was held that the restriction could no longer effect the purposes for which it was imposed. There is no such change here. In *American Weekly, Inc. v. Patterson*, 179 Md. 109, 115, 16 A. 2d 912, relied on by the appellees, it was said: "It has likewise long been a rule of equity that where the reason for enforcement of a restrictive covenant on land has ceased, as where the neighborhood has completely changed, equity will no longer

enforce the covenant, as to do so would be to encumber the economic use of land without at the same time achieving any substantial economic benefit to the covenantee." There has been no such complete change here. In *Whitmarsh v. Richmond*, 179 Md. 523, 529, 20 A. 2d 161, relied on by the appellees, the property was part of a larger tract which had been subdivided by a developer who had sold off lots in the development, some with and some without restrictions, which limited use to residential purposes. It was there said: "The restrictions imposed on the property here involved are unenforceable because of the fact, very clearly shown by the photographs offered in evidence, and as also stipulated, the property now is in a commercial district." The appellees rely on a number of out of state cases. As stated in 4 A. L. R. 2d 1118, 1119, with many cases supporting that statement: "Most jurisdictions now recognize a change in the character of a neighborhood as a ground for affirmative relief against restrictive covenants by way of cancelation or modification where the change has been so radical as to render perpetuation of the restriction of no substantial benefit to the dominant estate, and to defeat the object or purpose of the restriction." Compare *Kirkley v. Seipelt*, 212 Md. 127, 128 A. 2d 430.

In *Schlicht v. Wengert, supra,* 637, a suit for injunction was brought by a neighbor to enjoin the use of appellant's property in violation of a residential restriction. Appellant was using the property for a saloon. The subdivision in which the property was located was developed in 1922 and consisted of 210 lots. There was no reservation in the deed to the appellant's predecessors in title from the developer that the restriction should enure to the benefit of the adjoining lot owner. However, the same restriction was placed in all of the developer's deeds. There had been several taverns operated within the development in the past in violation of the restrictive covenant and at the time of the suit there were four saloons in operation. However, the evidence showed that the development was still primarily residential. It was held, in reversing the lower court, that the appellee had standing to sue, and that a general scheme of development existed.

Also, that the restrictions were still operative since "no ground is found for a holding that the neighborhood has become one in which a saloon next to the complainants, once prohibited by the covenant, is now appropriate, and no longer prohibited." In *Middleton Realty v. Roland Park,* 197 Md. 87, 97, 78 A. 2d 200, the appellant contended, among other things, that an equity court should not in its sound discretion enforce a restriction against the building of stores on Lot 4 because such enforcement would result in inequity. It claimed the restriction had outlived its usefulness or reason for existence, that the application for relief was addressed largely to the conscience of the court and was governed by equitable principles, and further that the whole block could be used for stores and there was no reason to forbid a store on Lot 4. In holding that the restriction should be enforced, this Court said: "Although this lot is only 43 feet wide, the chancellor found that there are one hundred and seventeen properties in Roland Park that are 40 feet in width or less. A small residence or an apartment could be built on this lot according to the testimony. There is no testimony to the contrary." In *King v. Waigand,* 208 Md. 308, 117 A. 2d 918, residents of a subdivision, Riversdale Park, sued to enjoin other such residents from selling spirituous liquor on certain property on which there was a covenant in their deeds against such sale. It was there asserted that this particular restriction in controversy imposed 65 years before, "in the horse and buggy days", had been rendered unenforceable by the change in the character of the neighborhood. Adjoining defendant's store was a tavern which sold beer and wine. On the same side of the road was a postoffice, a hardware store, a cleaning establishment, an animal hospital, a market and a fence company. On the other side of the road were three gasoline filling stations, a bank, a barbershop, a liquor store and other establishments. Also in the vicinity were a bottling factory, a refrigerator sales place, a shade shop, and a screen company. In holding the restriction enforceable this Court pointed out, among other things, that the covenant did not prohibit all commercial enterprises and there was no restriction, for example, against grocery stores.

Fieldstone is now an attractive and established residential development, extending along the north side of Liberty Road easterly from McDonogh Road about six or seven blocks and back to Church Road. The westernmost five blocks are almost fully developed with homes ranging in value from $13,000.00 to perhaps $37,000.00, the price range being on an average of between $20,000.00 and $30,000.00. The majority of the homes were constructed before 1940. In *Esso Standard Oil Co. v. Mullen,* 200 Md. 487, 490, 90 A. 2d 192, *supra,* it was held that on account of a change in the neighborhood the restrictions had outlived their usefulness. The facts of that case, however, appear quite different from those before us in this case. It was there said: "It was shown that the neighborhood is now dominantly and progressively commercial. There is a filling station on the southeast corner, and business establishments on the other two corners. On both sides of Park Heights Avenue and Rogers Avenue for several blocks the development is solidly commercial, although there are a few surviving residential frame dwellings to the north of the lots in question, one of which, however, is occupied by a paperhanger. In the tract in question, many of the interior lots have not been built upon, and many are unrestricted. The change in character is perhaps not so pronounced in the tract in question as in the surrounding area, particularly along the main arteries. However, we are not confined to a consideration of the particular area restricted." It is true, as above set out, that the area to the west of Fieldstone has been developed commercially. However, the commercial development seems to be confined to that area and not to the areas north, south and east of Fieldstone. It appears that this commercial area has in no way deteriorated Fieldstone as a residential development.

This case seems to resolve itself into whether the restrictions on Lot 110 should be waived for economic reasons. It is very evident that combined with Lot 111 it would be much more valuable. On the other hand it has value as presently restricted. It has not been proven that lifting the restriction on Lot 110 would not depreciate the value of the surrounding residential property. In fact the testimony is more to the

contrary. Of course, in zoning cases the fact that rezoning would make the property more valuable is not sufficient for rezoning. *Montgomery County Council v. Scrimgeour*, 211 Md. 306, 127 A. 2d 528. The cases of *Whitmarsh v. Richmond*, 179 Md. 523, 20 A. 2d 161, *supra; Matthews v. Kernewood, Inc.*, 184 Md. 297, 40 A. 2d 522; and *Easton v. The Careybrook Co.*, 210 Md. 286, 123 A. 2d 342, are relied on to hold that increased economic benefits to the owner should govern setting aside restrictions. We do not so interpret them. Although this factor need not be ignored, it is not controlling. *Welshire, Inc. v. Harbison*, 33 Del. Ch. 199, 91 A. 2d 404, 406; *Frick v. Foley*, 102 N. J. Eq. 430, 141 A. 172, affirmed 110 N. J. Eq. 573, 146 A. 914; *Continental Oil Co. v. Fennemore*, 38 Ariz. 277, 299 P. 132, 135; *Rombauer v. Compton Heights Christian Church*, 328 Mo. 1, 40 S. W. 2d 545, 553; *Bickell v. Moraio*, 117 Conn. 176, 167 A. 722, 724; *Ockenga v. Alken*, 314 Ill. App. 389, 41 N. E. 2d 548. If for economic reasons alone commercial developments were permitted on Lot 110, for the same reason they could be permitted on Lot 109A and east in Fieldstone along Liberty Road. Such was not the intention when the restrictions were placed on Fieldstone.

Finding that there is not sufficient evidence here to set aside the restrictions on Lot 110 to permit the commercial development, it is not necessary that we pass upon the question as to whether specific performance was the proper means of invalidating or modifying the restrictive covenants, compare *Pollack v. Bart*, 202 Md. 172, 95 A. 2d 864, or as to whether the use of the property in question for a gasoline service station would constitute a business purpose of "a recognized dangerous or offensive character" as forbidden by the restrictions.

*Decree reversed, with costs, and bill of complaint dismissed.*